UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 05-23037-CIV-JORDAN

**FLORIDA PEDIATRIC SOCIETY/
THE FLORIDA CHAPTER OF THE
AMERICAN ACADEMY OF
PEDIATRICS, et al.,**

    **Plaintiffs,**

v.

**SIMONE MARSTILLER, in her
official capacity as the Secretary for the
STATE OF FLORIDA, AGENCY FOR
HEALTH CARE ADMINISTRATION,
et al.,**

    **Defendants.**

_____/

## PLAINTIFFS' UNOPPOSED MOTION
## FOR APPROVAL OF AMENDED SETTLEMENT AGREEMENT

    The Individual Plaintiffs,[1] as representatives of the certified class, and the Organizational Plaintiffs,[2] (collectively, the "Plaintiffs") and Defendants, SIMONE MARSTILLER, in her official capacity as the Secretary for the State of Florida, Agency for Health Care Administration, ("AHCA") and JOSEPH LADAPO, M.D., in his official capacity as the Surgeon General of the State of Florida, Department of Health ("DOH," and collectively, the "Defendants"),[3] have

---

[1] The individual named plaintiffs are A.D., as the next friend of K.K.; R.G. and L.G. as the next friends of N.G.; E.W., as the next friend of J.W.; K.V., as the next friend of N.V.; S.B., as the next friend of S.M.; K.S., as the next friend of J.S.; and S.C., as the next friend of L.C.

[2] The organizational plaintiffs are the Florida Pediatric Society/The Florida Chapter of the American Academy of Pediatrics ("FCAAP") and Florida Academy of Pediatric Dentistry, Inc.

[3] By operation of Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Marstiller and Dr. Ladapo are automatically substituted as parties to this action for the previous agency heads of AHCA and DOH respectively.

1

reached an agreement to settle all of the remaining claims pending against the Defendants. The Plaintiffs, with the agreement of the Defendants (collectively, the "Parties") move for approval of an Amended Settlement Agreement (the "Amended Agreement" attached as Ex. A) pursuant to Fed. R. Civ. P. 23(e), and submit this Memorandum of Law in support.

## BACKGROUND

After more than a decade of litigation, the Parties entered into a Settlement Agreement dated April 5, 2016, to settle all the claims in this class action (the "2016 Agreement").[4] The Parties provided notice of the 2016 Agreement, and after briefing and hearing, this Court approved it in full on June 28, 2016.

### A.     The 2016 Settlement Agreement

The 2016 Agreement, attached as Ex. B, provided for a wide variety of steps to be taken by Defendants to improve access to medical and dental care, and to address the issues identified by this Court in its Findings, after a lengthy trial. A large number of those steps have been fully implemented. For monitoring of implementation, the 2016 Agreement required frequent meetings between Defendants' and Plaintiffs' representatives, including the leadership of the Organizational Plaintiffs. The 2016 Agreement imposed requirements on the Department of Children & Family Services ("DCF") designed to improve the Medicaid eligibility process for the members of the class. DCF, which made improvements to process for determining eligibility during the litigation, demonstrated that it had made substantial additional improvements to the process for determining eligibility and for avoiding wrongful terminations. It further demonstrated that it had made significant progress in correcting problems associated with creating an Unborn Baby file for

---

[4] The Parties signed an errata sheet on June 1, 2016, and submitted it to the Court as part of the motion for final approval, *see* ECF No. 1399 at 2 n.1 (June 17, 2016). References in this Joint Motion to the 2016 Agreement are to the settlement agreement as corrected by the errata sheet.

2

pregnant mothers so the new born child would be immediately eligible for Medicaid services.[5] In a related issue, AHCA made significant progress in reducing the prevalence of switching, and the parties soon agreed that those administrative issues had been successfully resolved.

The 2016 Agreement also required a program to incentivize pediatricians and specialists treating children on Medicaid—through enhanced payments for meeting performance metrics developed by AHCA and health plans contracting with AHCA to provide Medicaid managed care—so that such providers would offer prompt access to preventative and other medical and dental care. Thus, the 2016 Agreement established benchmarks for AHCA and specified additional steps that AHCA must take if those benchmarks were not obtained. The objective—shared by plaintiffs and defendants—was for Florida Medicaid to improve its performance and meet national norms for access to the medical and dental services, required under Medicaid to be made available to children with reasonable promptness. Plaintiffs believe, and this Court has found (Amended Findings of Fact and Conclusions of Law, Dkt. 1314, at p. 150) that provider compensation levels are an important determinant of access to care.

The 2016 Agreement required AHCA to establish an incentive program whereby eligible physicians who met certain quality of care metrics established by AHCA or proposed by the MMA plans and agreed to by AHCA would qualify for an enhanced payment, whereby they would be compensated for treating children on Medicaid by being paid at enhanced rates, equivalent to Medicare rates, for relevant services. Over the past five years, since implementation of the 2016 Agreement, hundreds of millions of additional dollars from efficiencies in the state's Medicaid

---

[5] Because DCF had accomplished what the Settlement Agreement required, DCF had no continuing responsibilities under the Court's jurisdiction after June 30, 2018. *See* Settlement Agreement VII.I.C.

managed care system have been paid to providers of pediatric care, as incentives to providers to improve access to care.

A principal route through which physicians qualified for enhanced payments was by becoming a patient centered medical home ("PCMH") as certified by a recognized health care organization such as the NCQA.  Research shows that PCMHs improve quality and the patient experience, and increase staff satisfaction—while reducing health care costs.  Another way physicians would qualify for the enhanced rate was by meeting certain HEDIS (Health Effectiveness Data and Information Set) quality of care metrics, selected by the MMA plan with which the patient was enrolled and approved by AHCA.  Common HEDIS measures included such metrics as whether a child received the required number of well-child screenings for a child of that age or whether a child had received a screening for the presence of lead in the child's blood.

In the first year, only board-certified pediatricians were eligible for the enhanced payment but soon the enhancement payment opportunity was expanded to include all pediatricians, family physicians, general practitioners, and all pediatric specialists—so long as they were providing services to children on Florida Medicaid and satisfied the agreed-upon quality of care metrics.  As of August 20, 2018, for example, 34.6% of the pediatricians and 20.6% of the doctors who treated children on Medicaid in Florida were paid at the enhanced rate.  By June 1, 2019, those numbers had risen to 41.1% of all pediatricians and 28.3% of all doctors.  The number of qualified providers had risen to 7,620 by the second year of the program, a sharp increase from 2,906 qualified providers in the first year.

According to AHCA, as of February 2019, about 68% of children on Medicaid who received a service from a pediatrician or a pediatric specialist were treated by a provider paid at the enhanced rate.  And the amount of money that Florida put into the program, which was more

than matched by federal dollars, increased as well. Including the federal match, the amount of money dedicated to paying enhanced rates to physicians treating children on Florida Medicaid increased from about $68 million in the 2017-2018 rate year to $187 million (including funds for children with special needs receiving care through Florida Medicaid' CMS program) in the 2018-2019 rate year.

The 2016 Agreement established the following metrics to judge progress on the medical component of the Medicaid program:

- Meeting a statewide Participation Ratio, as measured on line 10 of the CMS-416 Reports, at least equivalent to the national mean;

- Meeting a statewide Participation Ratio, associated with Line 10 of the CMS-416 Reports, of at least 75 percent for all aggregate age groups on a weighted average basis below the age of 10;

- Achieving a statewide weighted average of all MMA Plans that is equal to or exceeds the national Medicaid mean for at least eight (8) of the following nine (9) HEDIS measures:

    o   Adolescent Well Care Visits (AWC);

    o   Children & Adolescents' Access to Primary Care Practitioners (PCPs) -12–24 months;

    o   Children & Adolescents' Access to Primary Care Practitioners (PCPs) - 25 months – 6 years;

    o   Children & Adolescents' Access to Primary Care Practitioners (PCPs) - 7–11 years;

    o   Children & Adolescents' Access to Primary Care Practitioners (PCPs) -12–19 years;

    o   Well Child Visits in the First 15 Months of Life (W15) - 0 Visits (INVERSE);

    o   Well Child Visits in the First 15 Months of Life (W15) – 6 or more Visits;

    o  Well Child Visits in third, fourth, fifth and sixth years of Life (W34); and

    o  Lead screening in children (LSC).

Under the agreement, AHCA was to meet those metrics within 30 months of the October 1, 2016 Implemental Date of the agreement, or by March 31, 2019. Because of the time lag in the issuance of the CMS-416 reports and HEDIS data, compliance could not be measured until late 2019 or early 2020.

  In calendar year 2016, AHCA failed to meet four of the nine HEDIS measures, and one of the two CMS-416 measures. By the end of calendar year 2019, AHCA had met all but two of the metrics established to determine whether the Medicaid program had made adequate progress. One measure on which Florida was below the metric was a HEDIS measure for the percentage of children and adolescents between the ages of 12 and 19 who had a preventative visit with their primary care provider. The other was for the participation ratio on the CMS-416 report, where the measure was for the participation ratio for all age groups below the age of 10 on a weighted average basis. The target was 75% and Florida' results were slightly below that at 72.30%.

  Separately, the Department of Health implemented an at-risk, capitated plan for children with special needs on the CMS-component of Florida Medicaid, and as contemplated in Section IV of the settlement agreement, the incentive payment plan was extended to physicians providing care to Florida children on Medicaid though the CMS program. For instance, in the period from February 1, 2019 through September 30, 2020, a total of $22,145,512 in enhanced fees was paid to Florida doctors treating children through the CMS component of Florida Medicaid, with $9,395,336 of that amount going to primary care providers and $12,750,176 being paid to pediatric specialists.

  The 2016 Agreement also established metrics for measuring the progress of the dental component of Florida Medicaid. Because the dental program was lagging significantly behind the

national average for the state Medicaid programs, AHCA was given until September 30, 2021, a five-year runway to meet the required metrics, which were:

    A.    Meeting or exceeding a statewide weighted average of all MMA Plans that is equal to or exceeds the 2014 national Medicaid mean for HEDIS Annual Dental Visit measure (HEDIS ADV);

    B.    Meeting or exceeding the 2014 national average for the child Core Set PDENT measure; and

    C.    Meeting or exceeding the 2014 national average for the CMS-416 Report Dental Treatment Service measure (an agency measure defined as CMS-415 Report Line 12c divided by line 1b, excluding children less than one year of age).

The agreement established the following interim benchmarks to evaluate the progress of improvements in the provision of dental service through Florida Medicaid:

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Preventative Dental (CMS 416, Child Core Set PDENT | 35% | 37% | 39% | 41% | 44% |
| Dental Treatment Services (CMS 416, Line 12c divided by line 1b, excluding children less than 1 year of age) | 15% | 17% | 20% | 21% | 23% |
| Annual Dental Visit (HEDIS ADV) | 45% | 46% | 47% | 48% | 49% |

Florida has made progress in improving its dental care offered to children on Florida Medicaid, although more improvements are needed. For the 2019-2020 contract year, AHCA included $43.1 million in additional funds for dental care based on a projected increase in utilization. By the end of 2019, AHCA had met the interim target for preventative dental services, with 39.4% of eligible children receiving such services (up from 35.9% in 2016), but it still fell

short in terms of the percentage of children receiving dental treatment services, where its DTENT score was 15.73%, short of the interim target of 20%.

The Parties note that the COVID pandemic starting in early 2020 and increasing in impact during that year, affected Florida Medicaid just as it affected almost all aspects of society. Many parents stopped taking their children to the doctor's or dentist's office except in the case of an emergency, and so it was clear that AHCA would not be able to meet the remaining metrics established by the settlement agreement, at least for the foreseeable future, just as providers would not be able to meet certain of the quality metrics that were the prerequisites for enhanced payments. Accordingly, the parties discussed how to proceed, which culminated after extensive negotiations in this jointly proposed amendment to the settlement agreement.

B.     **The Proposed Amended Settlement Agreement**

Under the Amended Agreement, AHCA commits to take certain additional actions specified herein for the benefit of children served by Florida's Medicaid Program. As noted, when the COVID-19 pandemic struck, AHCA had met all but two of the required medical metrics to satisfy its obligations under the medical component of the settlement. Under the Amended Agreement, AHCA commits to continue to pay enhanced payments to qualifying medical providers at least through 2030. This represents a significant extension of its current commitment.[6] This long-running case is to be closed upon approval of the Amended Agreement.

Under the 2016 Agreement, a principal route through which physicians qualified for enhanced payments was by becoming a certified patient centered medical home. As part of the Amended Agreement, AHCA has committed to recognizing membership in a certified patient

---

[6] This commitment will apply unless "a change in federal or state law or a change in federal or state appropriation level, or a material change in circumstances outside of the control of AHCA or the State of Florida that renders the performance of any obligation of AHCA under this Agreement impossible."

centered medical home as one avenue by which physicians can qualify for the enhanced rate. AHCA has also agreed to establish a statewide alternative avenue based on HEDIS metrics, which will mean physicians who practice in a county with multiple MMA plans will no longer have to worry about meeting different HEDIS metrics for different plans to qualify for the enhanced payments.  While AHCA will retain some discretion to modify the qualifying criteria for enhanced provider payments (with the consent of FCAAP), AHCA's commitment to continue to provide enhanced payments for qualifying physicians ensures that it will continue to put a significant sum of state money, which will trigger increased federal funds, into enhanced payments for physicians treating children on Medicaid.

As for dental care, while AHCA had made improvement in its dental metrics, it was still short of several metrics when the COVID-19 pandemic hit. Under the Amended Agreement, AHCA has committed to additional funding to pay an enhanced rate for provision of services under certain procedural codes to qualified dentists treating children on Medicaid.  Those codes, commonly used by dentists when they treat children on Medicaid, resulted from negotiations between Defendants and Plaintiffs.  Those codes are:

| Procedure Code | | Service Category |
|---|---|---|
| D1330 | Oral Hygiene Instruction | Preventive |
| D1120 | Prophylaxis - Child | Preventive |
| D1208 | Topical application of fluoride - excluding varnish | Preventive |
| D1351 | Sealant - Per tooth | Preventive |
| D1206 | Topical application of fluoride varnish | Preventive |
| D1999 | Unspecified preventative procedure, by report | Preventive |
| D0120 | Periodic oral evaluation - established patient | Diagnostic |

| Procedure Code | | Service Category |
|---|---|---|
| D0150 | Comprehensive oral evaluation - new or established patient | Diagnostic |
| D1354 | Interim caries arresting medicament application. Silver Diamine Fluoride | Preventive |
| D0145 | Oral evaluation for a patient under three years of age and counseling with primary caregiver | Diagnostic |

For those codes, AHCA has committed to paying dentists who meet the qualifying criteria established by the amended settlement plan about 140% of the current Medicaid fee-for-service rates, a significant increase and the first increase in the Medicaid fee-for-service rates in years.

In short, the organizational Plaintiffs and class counsel believe the Amended Agreement will allow for continuation of the progress made under the 2016 Agreement, and will also provide for additional enhancements, as set forth above, benefitting the Class.

## ANALYSIS

### A.     The Amended Agreement Easily Meets the Standard for Court Approval

In deciding whether to approve an amended settlement, courts look to see if the settlement is "fair, reasonable, and adequate," the same standard courts apply to evaluating an initial settlement. *See Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Ford Motor Co.*, 2009 WL 3757040, at *12 (E.D. Mich., Nov. 9, 2009) ("The same standard applies when considering an amendment to a previously-approved class settlement agreement."); *see also, e.g., Gardner v. Lafarge Corp.*, No. 99-10176, 2007 WL 1695609, at *4 (E.D. Mich. June 12, 2007) (finding amended settlement agreement to be "fair, reasonable, and adequate"), *aff'd sub nom. Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, MDL 1203, 2003 WL 21641957, at *7 (E.D. Pa. Mar. 12, 2003) (amended agreement "fair, adequate, and reasonable" under same standards

10

used to approve prior settlement agreements), *aff'd*, 385 F.3d 386 (3d Cir. 2004). The proposed settlement here, easily clears that bar set forth in Rule 23(e).[7]

The Amended Agreement extends the enhanced rate of payment provided under the current agreement to qualified medical providers for seven more years, until 2030, thereby encouraging physicians to continue to participate in Florida Medicaid and promoting improved access to care for Class members. Equally important, the Amended Agreement for the first time makes enhanced payment rates available to qualifying dental providers. Again, that will encourage more dentists to participate in Florida Medicaid and will promote improved access to care for Class members.

Those additional benefits—without any offsetting negative changes for the class—negotiated by counsel that have represented the Class for more than 15 years, and negotiated without seeking compensation for counsel since the original settlement was approved in 2016, warrant approving the Amended Agreement. The leaders of the two organizational plaintiffs, FCAAP and FAPD, support the Amended Settlement Agreement, which provides all physicians and dentists the same opportunity to qualify for the enhanced rates, a fact which further weighs in support of approval. *See, e.g.*, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab. Litig.*, 385 F.3d 386, 389 (3d Cir. 2004) ("Because we believe that the Sixth Amendment provides class members with additional rights that did not exist under the original

---

[7] Rule 23 that in deciding whether to approve a settlement, a court must consider whether:
    (A) the class representatives and class counsel have adequately represented the class;
    (B) the proposal was negotiated at arm's length;
    (C) the relief provided for the class is adequate, taking into account:
        (i) the costs, risks, and delay of trial and appeal;
        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
        (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
        (iv) any agreement required to be identified under Rule 23(e)(3); and
    (D) the proposal treats class members equitably relative to each other.

Settlement Agreement (specifically, the right to sue Wyeth, albeit subject to certain conditions) we will affirm the District Court's approval of the Amendment as fair, adequate and reasonable."); *In re Sulzer Prosthesis Liab. Litig.*, 2002 WL 553728, at *1 (N.D. Ohio, Mar. 14, 2002) (granting approval to amended settlement agreement that increased overall value of the settlement and eliminated liens on defendants' assets for the benefits of opt-outs).

In evaluating a proposed settlement, courts in the Eleventh Circuit also consider what are known as the *Bennett* factors, after the decision in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Those factors include (1) "the likelihood of success at trial"; (2) "the range of possible recovery"; (3) "the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable"; (4) "the complexity, expense and duration of litigation"; (5) "the substance and amount of opposition to the settlement"; and (6) "the stage of proceedings at which the settlement was achieved." *In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021).

The *Bennett* factors also militate strongly in favor of approval of the amended settlement. As for the first through third factors,[8] it is unlikely that the class could achieve greater success or a higher level of recovery by resuming adversarial litigation. As for the fourth factor,[9] additional litigation would be costly, expensive, and protracted, all of which would be prejudicial to the Class and weigh in favor of approving the amended agreement. As for the fifth and sixth factors,[10] it is unlikely any class members would object (as noted the leadership of the two organizational

---

[8] "[T]he likelihood of success at trial," "the range of possible recovery,"; and "the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable."
[9] "[T]he complexity, expense and duration of litigation."
[10] "[T]he substance and amount of opposition to the settlement" and "the stage of proceedings at which the settlement was achieved."

plaintiffs have endorsed the Amended Settlement Agreement), and the Parties have arrived at the Amended Agreement after a decade of litigation and another six years of settlement-monitoring.

      **B.**     **New Notice Is Not Required Before Approval of the Amended Agreement**

Federal Rule of Civil Procedure 23(e)(1)(A) requires "[t]he parties [to] provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Rule 23 does not require new notice to class when the changes in an amended settlement, as is the case here, are not detrimental to the class. *Compare Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018) ("Material alterations to a class settlement generally require a new round of notice to the class and a new Rule 23(e) hearing."), *and In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 58 (D. Mass. 2005) ("If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.") (quotation marks and citation omitted), *with Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, *9 (N.D. Ill. 2019) ("[N]o new notice is required where changes to a proposed settlement are objectively favorable for class members and do not prejudice any benefit previously promised"). Courts routinely hold that no new notice is required when changes to a proposed settlement are objectively favorable for class members and do not prejudice any benefit previously promised. *See*, *e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) (Koh, J.) (collecting cases).

Because the changes in the settlement are beneficial to class members, as demonstrated above, no additional notice to the class is required.

## CONCLUSION

The Parties are proud of what has been accomplished through the 2016 Agreement. The Amended Agreement will ensure that the more than 2 million children in Florida's Medicaid program will enjoy ongoing improvements in their access to medical and dental care for years to

come. With gratitude to the Court for its many years of work on this case, the Plaintiffs, with agreement of the Defendants, respectfully request that the Court grant approval to the Amended Agreement.

        Respectfully submitted,

        **BOIES SCHILLER FLEXNER LLP**

        By: /s/ Stuart H. Singer
            Stuart H. Singer
            (Florida Bar No. 377325)
            Carl E. Goldfarb
            (Florida Bar No. 125891)
            401 East Las Olas Blvd., Suite 1200
            Fort Lauderdale, Florida 33301
            Telephone: (954) 356-0011
            Facsimile:  (954) 356-0022
            Email: ssinger@bsfllp.com
            Email: cgoldfarb@bsfllp.com
            Email: ftleserve@bsfllp.com

            Benjamin D. Geffen
            (Admitted pro hac vice)
            Senior Attorney
            Public Interest Law Center
            1550 JFK Blvd., Suite 802
            Philadelphia PA 19102
            Telephone: (267) 546-1308
            Email: BGeffen@pubintlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will electronically mail notification of such filing to all counsel of record who have appeared in this case.

By: /s/ Carl E. Goldfarb
Carl E. Goldfarb